PAUL V. KAESSER v. CHARLES U. BECKER, Secretary of State, and ALBERT H. HAMEL, Intervening Defendant, Appellants.

In Banc, July 18, 1922.

1. **REFERENDUM: Sufficient Petitions: Eleven Districts.**  Where it is admitted that sufficient petitions for the referendum of a legislative act were not filed from five congressional districts, petitions signed by at least five per cent of the whole number of voters in each of the remaining eleven districts must be filed, or the act cannot be referred.

2. ———: ———: **Signature: Signed by Others.**  Names of voters signed by the circulator of a petition for a referendum, without authority, prior or subsequent, from the purported signers, are not legal signatures.  And uncontradicted testimony by said voters that they did not authorize the circulator or any one else to sign their names thereto, is sufficient for rejecting their names; and

where the circulator testifies that she signed the names of certain relatives and friends in their presence and at their individual request, and they firmly deny that they signed their names thereto or authorized her to do so, the finding of the master in chancery, approved by the chancellor, that their names should not be counted, will not be disturbed on appeal.

3. ——: ——: ——: **Overcoming Circulator's Affidavit.** Where persons whose names appear on a petition testified that they were Russians and could not read English, and that no petition had ever been presented to them, and stoutly denied having signed the referendum petition and that they had given any one else authority to sign their names to it, and their testimony was not contradicted except by the prima-facie proof furnished by the circulator's affidavit, the finding of the master in chancery, approved by the trial court, that their signatures should not be counted, will not be disturbed on appeal.

4. ——: ——: ——: **Without Authority: By Voter's Son.** The signature of the voter signed by her son, twenty feet from her immediate presence, and without her authority or knowledge, should not be counted as a part of a referendum petition,

5. ——: ——: ——: ——: **By Sister: No Objection.** The signature of a voter on a referendum petition, signed by his sister in his absence and without his authority and without subsequent information to him, although she testifies that she had signed his name to other petitions and that on being told that she had done so he did not object, should not be counted.

6. ——: ——: **Prima-Facie Valid.** A petition for the referendum of a legislative act, purporting to have been signed by legal voters, with the address of each stated thereon, and supported by the statutory affidavit of the circulator and filed in the office of the Secretary of State, is prima-facie proof of the genuineness of such signatures, that each person whose signature appears thereon resided at the address stated, and that such persons were legal voters; and upon the presentation to the Secretary of State of a petition which on its face shows such facts, it is not only his duty to accept and file it, but its prima-facie character continues in a suit to enjoin him from submitting the act to a referendum until it is overcome by other competent evidence.

7. **DEFINITION: Prima-Facie Proof.** Prima-facie proof is such evidence as in the judgment of the law is sufficient to establish the fact, and if not rebutted remains sufficient for the purpose; it is such proof as puts upon one contending against it the duty to show by his own contrary proof that it is not true, and in the

absence of such contrary proof it is sufficient to establish the fact finally.

8. **REFERENDUM: Sufficiency of Petitions: Illegal Signatures: Preponderance of Evidence: Equity: Deference to Chancellor.** In any case where proof is offered to overcome the prima-facie proof of the genuineness of signatures on a petition for a referendum of a legislative act, prima-facie valid because on its fact it complies with the statute in showing the signatures and resident addresses of purported legal voters and the statutory affidavit of the circulator, it is the duty of the trier of the facts to determine the genuineness of the signatures like any other fact in a civil case, from a fair preponderance of all the evidence; and in a case to enjoin the Secretary of State from submitting the act to a referendum, although a suit in equity and therefore upon appeal triable *de novo* in the Supreme Court, whose duty it is to review the evidence and make its own finding, the court naturally and properly defers largely to the conclusions of the master in chancery, particularly so where his findings have been approved by the trial chancellor.

9. ———: ———: **Acceptance by Secretary of State: Finality: Absence of Fraud.** Acceptance by the Secretary of State of petitions for the referendum of a legislative act and his determination of their sufficiency is not by the statute made final in the absence of fraud. After he has accepted and filed them, their sufficiency may be challenged for any legal reason. Signatures to petitions apparently legally sufficient may have been procured by fraud. and petitions signed in the utmost good faith may be shown to be legally insufficient.

10. ———: ———: **Signatures: Duplications: Under Age.** Signatures on a petition for the referendum of a legislative act which are admitted to be duplications of others should not be counted. Nor should the signature of a person admitted to be below legal voting age.

11. ———: ———: ———: **Signed by Others: Ratification.** The signature of a legal voter, whose wife in his absence signed his name to a petition for the referendum of a legislative act, whom she told three or four days later that she had signed his name thereto, to which he made no objection and said it was alright, complies neither with the initiative-and-referendum amendment of the Constitution nor with the statute, and should be rejected. To accept such signature made under such circumstances on the ground that it was ratified by the purported signer would be to open wide the doors to fraud.

12. ———: ———: **Affidavit: By Others than Circulator: Aliunde Proof.** The affidavit to a referendum petition should contain in substance the facts set out in the form suggested in the statute, and the fact that the signatures of the signer were made in the presence of the affiant is one of the substantial facts to be included in the affidavit, without which the petition is not prima-facie proof of its sufficiency; and if such petition is challenged when offered in court, and it develops under the proof that the petition was not signed in the presence of the affiant or that the affidavit is false in any other material statement or that any material fact has been omitted therefrom, those asserting the sufficiency of the petition should furnish proof *aliunde* of the necessary facts, such as the testimony of the circulator, and the genuineness of the signature then becomes a question of fact, to be established by proof, independent of the affidavit, that the signer was a legal voter of the district covered by the petition and that his purported signature is genuine, and on such proof his signature may be counted, but otherwise should not be counted.

13. ———: ———: **Wisdom of Act.** In a suit to enjoin the Secretary of State from submitting a legislative act to the people for their approval or rejection on the ground that the petitions for the referendum are insufficient, in that they do not contain the signatures of a sufficient number of legal voters, or that the signatures have been illegally attached, or that the petitions were not signed in the presence of the affiant, the court is not concerned with the merits of the legislative act, but it is nevertheless its duty to enjoin the submission of an act when the petitions therefor do not substantially comply with the constitutional and statutory requirements relating thereto.

Appeal from Cole Circuit Court—*Hon. John G. Slate,* Judge.

Affirmed.

*Jesse W. Barrett,* Attorney-General, and *Albert Miller,* Assistant Attorney-General, for Secretary of State; *Dumm & Cook* for intervening appellant.

(1) The court committed error in overruling the exceptions filed by appellant and intervening appellant to the findings of facts made by the special master in

chancery; and committed error in sustaining and approving the findings of fact made by the special master and in rendering the judgment herein. (a) The primafacie case as to the sufficiency of the referendum petition filed, made for the proponents of the petition by the petition itself, the signatures contained thereon, together with the verification of the circulators thereof, has not been overcome by the preponderance of the evidence in this case, the question of fraud being eliminated. Article IV, sec. 57, Mo. Constitution; Secs. 5906 to 5909, R. S. 1919; State ex rel. v. Carter, 257 Mo. 52, 77; State ex rel. v. Roach, 190 S. W. 280; State ex rel. v. Sullivan, 283 Mo. 547, 592; Woodward v. Barbur, 59 Ore. 70; Re Initiative Petition, 26 Okla. 487, 109 Pac. 732; State ex rel. v. Olcott, 62 Ore. 277, 125 Pac. 303; State ex rel. v. Olcott, 135 Pac. (Ore.) 902. (b) Any person who is a qualified elector may sign a petition for the referendum. Sec. 5914, R. S. 1919. (c) The names on a petition are entitled to be counted where the name of the verifying petitioner appears on any section of the petition. Thompson v. Vaughan, 159 N. W. (Mich.) 65, 70; Re Opinion of Justices, 95 Atl. (Me.) 869. (d) The procedure by the referendum under the statute is sufficient if substantially followed. State ex rel. v. Carter, 257 Mo. 52, 79; Kress v. Estes, 43 Okla. 213, 142 Pac. 411; State ex rel. v. Superior Court, 81 Wash. 623, 143 Pac. 461; Minges v. Merced, 27 Cal. App. 15, 148 Pac. 816; Norris v. Cross, 25 Okla. 287, 105 Pac. 1000; Palmer v. Benson, 50 Ore. 277, 91 Pac. 579; Stevens v. Benson, 50 Ore. 269, 91 Pac. 577; Day v. Salem, 65 Ore. 114, 131 Pac. 1028. (e) The fact that there are many names, places of residence and voting precincts, all apparently in the same handwriting upon the petition for referendum, is not sufficient to justify the conclusion that the names were written thereon fraudulently, and that they should therefore be rejected. Thompson v. Vaughan, 159 N. W. (Mich.), 65, 69. (f) The failure of certain signers of a petition to state the county and state

in which they live, in addition to the city or village, is not such a defect as requires the rejection of such names. Bartling v. Wait, 96 Neb. 532, 148 N. W. 507. (g) The Secretary of State having authority to determine the sufficiency and validity of referendum petitions, his decision is final in the absence of fraud. State ex rel. v. Graves, 90 Ohio, St. 311, 107 N. E. 1018; Thompson v. Vaughan, 159 N. W. (Mich.) 68; Woodward v. Barbur, 59 Ore. 70, 116 Pac. 101; Re Initiative Petition, 26 Okla. 487, 109 Pac. 732; Re Initiative Petition, 35 Okla. 49, 127 Pac. 862. (h) The presumption is that all signatures of a referendum petition are valid, because of the fact that it is made an offense by statute for any person to intentionally sign a referendum petition with any name other than his own, or to knowingly sign his name more than once for the same measure, or to sign such petition when he is not a legal voter. Sec. 5914, R. S. 1919; State ex rel. v. Olcott, 135 Pac. (Ore.), 902; State ex rel. v. Olcott, 62 Ore. 277, 125 Pac. 303. (i) The testimony introduced in this case by the proponents of the Act is not sufficient to impeach the validity of the signatures. Article IV, sec. 57, Mo. Constitution; Secs. 5906 to 5909, R. S. 1919; Sec. 5914, R. S. 1919; State ex rel. v. Carter, 257 Mo. 52; Re Initiative Petition, 35 Okla. 49, 127 Pac. 862; Woodward v. Barbur, 59 Ore. 70, 116 Pac. 101; State ex rel. v. Olcott, 62 Ore. 277, 125 Pac. 303. (j) The fact that the names of the signers were not copied legibly in the verification clause, or did not exactly correspond with the names as they appeared on the face of the petition, is not sufficient to exclude such signatures, in the absence of any other proof of disqualification. Re Initiative Petition, 35 Okla. 49, 127 Pac. 862. (k) The mere fact that signers of said petition gave their place of residence or postoffice address, as general delivery, St. Joseph, Missouri, or that signers of said petition were not found to reside or to have resided at the address stated on the petition, is not in itself sufficient to invali-

date such signatures. Such errors are cured by the saving clause in the statute to the effect that: ''The forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors.'' Sec. 5908, R. S. 1919; State ex rel. v. Carter, 257 Mo. 52; State ex rel. Hill v. Olcott, 135 Pac. (Ore.) 902. (1) A signature to a referendum petition is not illegal for the reason that it is illegible, in the absence of a showing that it is not genuine. State ex rel. Hill v. Olcott, 135 Pac. (Ore.) 902. (m) In case of the omission of the *jurat* or signature thereto upon an affidavit to a sheet of the referendum petition, the fact that the oath was administered at the time may be shown *aliunde*. McCartney v. Branch Bank, 3 Ala. 709; Kruse v. Wilson, 79 Ill. 233; Cook v. Jenkins, 30 Iowa, 452; James v. Logan, 82 Kan. 285; Dunlap v. Clay, 65 Miss. 454; Hart v. Jones, 6 Kulp (Pa.) 326; Wiley v. Bennett, 9 Baxt. (Tenn.) 581; Farmers' Bank v. Gettinger, 4 W. Va. 305; Neff v. Alvin, 182 Ill. App. 41; Turner v. St. John, 8 N. D. 245, 78 N. W. 340; Finley v. West, 51 Mo. App. 569; Sage v. Stafford, 59 N. Y. Supp. 545. In such case the officer may sign after proof is made. Finley v. West, 51 Mo. App. 569. (n) In legal contemplation ''to sign'' means to attach a name, to cause it to be attached, to assent to it being attached, or to ratify or adopt it after it has been attached by any of the known methods. Lamaster v. Wilkerson, 143 Ky. 226, 136 S. W. 217; Hamilton v. State, 103 Ind. 96, 2 N. E. 299; Herrick v. Morrill, 37 Minn. 250, 33 N. W. 849; In re Deep River National Bank, 73 Conn. 341; Ardery v. Smith, 35 Ind. App. 94; Cummings v. Landes, 140 Iowa, 80, 117 N. W. 22.

*Lewis C. Gabbert* for respondent.

(1) This is the proper action; brought before the proper tribunal; and there has been an ample showing by clear, cogent, convincing and uncontradicted proof

that the petition is not legally sufficient. (2) While the petition from the Fourth District on its face is sufficient, and clearly under the law the Secretary of State had no alternative but to file same, yet respondent's suit is to enjoin appellant from proceeding further with the petitions; and respondent willingly assumes the burden of proving the petition on file is not in compliance with the law, in the tribunal, and by the action required and directed by the law. The court had no alternative. Art. 4, sec. 57, Mo. Constitution; R. S. 1919, sec. 5909; State ex rel. v. Carter, 257 Mo. 77; State ex rel. McNary v. Olcott, 125 Pac. (Ore.) 303. (3) Sheet number 59, circulated by Mrs. Bessie Foster and sworn to by Dr. Phene Skinner, containing forty names, and sheet number 35, circulated by Ora Earl Whitsell and sworn to by Dr. J. C. Whitsell, containing forty names, should be stricken. Neither of these sheets, embracing eighty names, were sworn to by the circulator; not one of the names were signed in the presence of the affiant; and each sheet is confessedly supported by a wholly false verification. R. S. 1919, sec. 5908. (4) Sixteen names were written by others without authority, prior or subsequent; thirteen names were written by others without authority, but without objection when afterwards informed of it; seventeen names boldly copied by E. S. Gartland from the petition of Carl McCombs; totaling forty-six names that were written beneath the printed words of the statute declaring such act a felony and heading this petition. This is not complying with the statutes in form or substance. It is a flagrant violation of the statute. R. S. 1919, secs. 5906, 5908. (5) Two hundred and six names appear on various sheets of the petition over affidavits in the very words of the statute "and each of them signed his name in my presence." Not one of these were signed in the presence of the affiant who verified such sheets. These names should be stricken, because the sheets upon which they appear have not been verified by the person "who

circulated said sheet of said petition.'' R. S. 1919, sec. 5908. (6) We are unable to follow the reason for appellant's contention that the three persons who gave their residence as of a place outside the Fourth District should be counted. The language of the Constitution and the statute, ''signed by five per cent of the legal voters in each of at least two-thirds of the congressional districts in the State,'' is so plain that he who runs may read. Mo. Constitution, art. 4, sec. 57; R. S. 1919, sec. 5907. (7) While it is conceded that failure to write an address opposite one's name on the petition where such signer was shown to be in fact a bona-fide resident of the district, might not justify striking such name from the petition, yet in the signatures of four persons who gave their addresses as ''General Delivery, St. Joseph, Mo.'' clearly should not be counted, for either they had no place of residence or openly flouted the provision of the statutes requiring residence to be given, in a city such as St. Joseph requiring street and number to be given. Furthermore, the burden was upon the appellant to show actual residence, when the petition on its face showed a fictitious or impossible address. The petitions in this incident failed to make a prima-facie case, the burden was on the appellant and appellant offered no proof. R. S. 1919, sec. 5906; Woodward v. Barbur, 116 Pac. (Ore.) 101.

DAVID E. BLAIR, J.—Appeal from a decree of the Cole County Circuit Court at the suit of a tax-paying citizen, enjoining the Secretary of State from submitting to a referendum vote of the people Senate Bill No. 433 passed by the Fifty-first General Assembly.

On July 7, 1921, Albert H. Hamel was given leave by the trial court to that end and filed therein his answer as an intervening defendant. As appears from its title Senate Bill No. 433 is ''An Act to amend Article 1, Chapter 65, of the Revised Statutes of Missouri, 1919, pertaining to 'medicine, surgery and mid-

wifery,' by repealing Section 7332 and enacting in lieu thereof two new sections pertaining to the same subject to be known as Section 7332 and Section 7332a," and popularly known as the Medical College Bill.

It is unnecessary to review even the substance of the pleadings. The sole question for our determination is the legal sufficiency of the referendum petitions filed from the Fourth Congressional District. .Without the petitions from that district, it is admitted that the effort of the opponents of said legislative act to refer it to the people must fail. We quote from the statement in appellant's brief as follows:

"The controversy in this case is confined to the sufficiency of the referendum petition with reference to the number of legal petitioners from the Fourth Congressional District. The sheets filed from said district contained the names of 3544 petitioners, the minimum number required is 3513. On its face, the petition contains thirty-one petitioners over and above the number required.

"Of the number of petitioners from said Fourth Congressional District respondent claims nineteen, through inadvertence, signed the same twice. To this contention appellants accede. Respondent further contends that one person who signed said petition was under the age of twenty-one years. To this contention appellants accede. The remaining petitioners, 3524, or 11 over and above the required number, from said Fourth Congressional District, it is the contention of appellants, are legally qualified petitioners."

The Attorney-General was originally made a party defendant, but it developed that he had certified the ballot title to the Secretary of State prior to the institution of the suit and the case was dismissed as to him. Hon. N. G. Sevier was appointed as special master in chancery by the trial court and filed his report therein. In addition to the conceded facts that nineteen signatures to the petition in said Fourth Congression-

al District were duplicates and one signature was by a person under legal age, the master in chancery found that sixteen of the signatures on said petition were placed thereon by other persons "without the knowledge or authority, prior or subsequent, of the persons whose names they purport to be;" that thirteen other names appearing as signers "are names which were written on said petition without prior authority of the persons whose names they purport to be, the writing of which was subsequently ratified by said persons." He further found that the names of 235 other persons appearing on the petitions were not signed in the immediate presence of the person who made affidavit to the sheet or sheets of said petition on which said names appear; said master in chancery found that no fraud whatsoever was practiced by the Secretary of State in counting the names upon petitions presented to him and filed in his office, and that said Secretary of State had no means of knowing or ascertaining the legality of the signatures thereon. We have omitted certain findings of the master in chancery as to other names appearing on the petition, being few in number, which we think need not be discussed in this opinion. In due time appellants filed their exceptions to the report of the master in chancery, and thereafter the trial court found said exceptions to be without merit, and overruled the same and approved the report and finding of facts of the master in chancery, and entered judgment in favor of the plaintiff and against the defendant Secretary of State and the intervening defendant, and made permanent the temporary injunction theretofore granted restraining the Secretary of State, his attorneys, agents and employees from doing any act in furtherance of submitting said Senate Bill No. 433 to the people at the next general election. After unsuccessful motion for new trial, defendants have appealed.

I. The sole question before us is the correctness of the finding of facts made by the master in chancery and

approved by the trial court. The contention is that
such findings are not supported by the pre-
ponderance of the evidence. · The initiative-
and-referendum amendment to the Con-
stitution of Missouri (Section 57, Article IV) provides
that the referendum may be ordered upon legislative
acts by the petitions of five per cent of the legal voters
in each of at least two-thirds of the congressional dis-
tricts in the State or by the legislative assembly itself.
Appellants admit that sufficient petitions were not filed
from five of the sixteen congressional districts, and re-
spondent makes no contention that the petitions sub-·
mitted from ten of the congressional districts of the
State were not in every way sufficient. Legal and
sufficient petitions from eleven congressional dis-
tricts must be presented to and filed in the office of the
Secretary of State within the prescribed time to au-
thorize the submission of a legislative act to the referen-
dum vote of the people. If, therefore, the petitions sub-
mitted from the Fourth Congressional District do not
contain the requisite number of signatures of legal
voters of said district, said referendum must fail.

*Legal Petitions.*

The issues of fact are thus brought within a very
narrow compass. It stands admitted that 3513 signatures
of legal voters in said Fourth Congressional District
is the minimum number of signatures required, and ap-
pellants do not claim that said petitions on their face
contain more than 3544 signatures of legal voters, and
they admit that twenty of these must be held to be il-
legal signatures, leaving the exceedingly small margin
of eleven signatures, upon the legality of which depends
the right to refer the act in· question. If, therefore, the
'finding of the trial court should be fully sustained as to
any one of the groups of signatures above referred to,
the judgment below must be affirmed.

II. At page 622 of the abstract of the record there
is printed as part of the record of the master in chan-

cery a list of sixteen names which he reports were writ-
ten on said petitions without the authority,
**Signatures Written by Others.** prior or subsequent, of the persons whose
signatures they purport to be, to-wit: Mrs.
J. T. Adkisson, H. L. Matthews, Mrs. Geo.
Sauer, Mrs. Marie Scott, W. D. Blackston, Florence
Meek, Mrs. Frankie E. Barbee, Louise Weare, Patrick
Buckley, Mike Birnbaum, Hannah Birnbaum, Bud How-
ard; Ressa Spiers, B. J. O'Malley, C. L. Gallagher, and C.
Gallagher. To this list the testimony shows the name of
George Meek, of Wallace precinct, Buchanan County, ap-
parently should be added, as his testimony is as strong
in denial of the genuineness of his signature as that of
any of the others listed by the master in chancery. Re-
spondent claims another signature was affixed by a per-
son under legal voting age and should not be counted.
The name is not given and we have not deemed it neces-
sary to search the entire record to find it.

Of these seventeen names Mrs. Effie Hickerson se-
cured the signatures of eight upon two different peti-
tions. She testified generally that the signatures on the
petitions were genuine, except in certain specified in-
stances. She testified that H. L. Matthews signed the
petition, but omitted to give his address, which she later
supplied herself from the city directory without even
being certain it was the same Matthews or that the
name in the directory was Matthew or Matthews.
Matthews denied signing the petition. He testified that
he always signed his name "Matthews" and the peti-
tion has it "Matthew," omitting the final "s." He also
testified that no other person of the same name lived at
the address given.

Mrs. Hickerson testified that she signed the names
of certain of her friends and relatives, including W. D.
Blackston, Florence Meek, George Meek and Mrs.
Frankie Barbee, in their presence and at their individual
request. All of the persons named testified, not only that
they did not sign their names to the petition, but firmly

denied authorizing Mrs. Hickerson, to do it for them. All of the above four persons were acquaintances of long standing of Mrs. Hickerson, and Mrs. Barbee was a sister-in-law. No motive for their swearing falsely is shown, and it is hard to see how they could well be mistaken under the circumstances. As to the controversy over the last four names and H. L. Matthews, there is abundant testimony to support the finding of the master in chancery. There is no contention of mistaken identity.

Three other names secured by Mrs. Hickerson were C. L. Gallagher, C. Gallagher and B. J. O'Malley. C. L. Gallagher denied his purported signature and testified that he did not authorize any one else to sign his name. C. Gallagher, who is the father of C. L. Gallagher, testified likewise. B. J. O'Malley denied his purported signature or authority in any one to sign his name. All three of the above testified that there were no other persons of the same name at the addresses given. We have carefully examined Mrs. Hickerson's testimony, and have failed to find any specific reference whatever therein to the signatures of the three persons named.

The names of Louise Weare and Ressa Spiers appear on petition 19 at lines 31 and 27 respectively (as is shown from the testimony). One John G. Bauenlein circulated this petition after twenty-eight or thirty names were already written on it, and he made the statutory affidavit thereto covering all the names thereon. Both of the above women denied their purported signatures and testified that no one had authority to sign their names. Ressa Spiers said she signed her name "Ressie" and not "Ressa" as it appears on the petition, while Louise Weare testified that there were no other persons in St. Joseph who spelled the name with the final "e" as she did. Both testified that no other persons of the same names were living at the addresses given. Bauenlein did not testify specifically as to the genuineness of these signatures or that the names were signed by authority of said persons. Appellants have

not pointed out any testimony in the record to this effect. It is not even shown that these signatures were secured by Bauenlein.

Mrs. Marie Scott, 408 South Fifth Street, St. Joseph, denied that any petition was signed by her and denied the genuiness of her purported signature. E. F. McNamara testified that he circulated the petition and that Mrs. Scott's name was signed by her husband. Appellants have not directed our attention to proof in the record of the authority in the husband to sign Mrs. Scott's name and we have found none.

The master in chancery held that the purported signatures of Mike Birnbaum and his wife Hannah Birnbaum could not be counted. The addresses of both were given at the location of their shop, instead of their residence. Both stoutly denied signing the petition. They were Russians and neither could read English. They had given no one authority to sign their names and no petition had even been presented to either of them. The name of George J. Wallace, Jr., is mentioned in the testimony as being the circulator of this petition. Wallace was not introduced as a witness and appellants have pointed out no testimony in the record tending to contradict Birnbaum and his wife, and we have found none, except the prima-facie proof furnished by the circulator's affidavit.

The master in chancery held that the purported signature of Mrs. J. T. Adkisson could not be counted. She testified as a witness and denied the genuineness of the signature. No other person of the same name lived at the given address and no other family spelling the name "Adkisson" lived in St. Joseph. Her name appeared on sheet 18, which J. R. McGarry circulated. He testified that Mrs. Adkisson's name was signed by her husband while she was not present. It is not shown that her husband was authorized to sign her name.

Mrs. Geo. Sauer denied signing her name or the authority of any one to sign it for her. The same J. R.

McGarry testified that he circulated the petition upon which her name appears, and that her son Peter Sauer signed her name when she was present and about twenty feet away. He did not testify that she was aware that her son was signing her name or that she authorized him to do it for her. Peter Sauer did not testify.

The name of Pat Buckley appeared on petition 23 at line 18. His sister Mary Buckley testified that she signed his name when he was not present and without his authority, and that she had never even told him that she had signed his name. She testified that she had signed other petitions with his name and had told him about having signed the same and that he had never made any objection. Nellie Nolan circulated this petition and she testified that Pat Buckley was away at work at the time Mary Buckley signed his name for him. Neither Miss Nolan nor any other witness testified to any authority on the part of Mary Buckley to sign her brother's name. Pat Buckley did not testify.

The name of Bud Howard, a negro porter, appeared on one of the petitions as a signer. As a witness he finally denied his signature, after apparently being confused on account of his signature to an affidavit he had made. J. R. McGarry testified that he had procured this signature and that Howard's name had been signed by J. H. Wilson, the proprietor of the saloon where Howard worked and that Howard was present and authorized the signature by Wilson. Wilson did not testify. There is some doubt in our minds concerning the correctness of the finding of the master in chancery as to this signature, because of the positive testimony of McGarry and the evident uncertainty and confusion in the testimony of Howard.

It appears from the foregoing review of the testimony, which we have very carefully studied, that the names of at least sixteen persons were signed to the various petitions by persons other than those whose names appear thereon without the authority of such persons.

An analysis of the testimony of the circulators of petitions concerning the foregoing names shows the following:

In only one case, H. L. Matthews, did the circulator claim that the signature was actually affixed by the person named. In four instances the signatures were claimed to have been affixed by the circulator in the presence and at the request of the alleged signers, to-wit: W. D. Blackston, Florence Meek, George Meek and Mrs. Frankie Barbee. In one instance, Mrs. George Sauer, the alleged signer, was twenty feet away when her son signed her name, and there is no showing that she authorized her name to be signed, or even knew it was being signed. In the case of seven signatures (C. L. Gallagher, C. Gallagher, B. J. O'Malley, Louise Weare, Ressa Spiers, Mike Birnbaum and Hannah Birnbaum) the circulator did not testifiy concerning the genuineness of the particular signatures or that they were signed by any authority whatever. There is no testimony in the record which could apply to the signatures, except such as is of a most general nature relating to the correctness of the lists and the genuineness of the signatures as a whole. This sort of testimony is of little more probative value than the affidavit itself, since such testimony is to be expected in support of an affidavit already made. As to three signatures (Mrs. Marie Scott, Mrs. J. D. Adkisson and Pat Buckley) the circulator admitted that the names were signed by others in the absence of the persons whose names were signed.

Recapitulating, the circulators do not, by specific and definite testimony, claim actual signatures or direct authority for signatures in more than five instances. In eleven cases there is no specific showing of express authority. In the case of the four names which Mrs. Hickerson claims she signed in the presence and at the request of the persons whose names she signed, the master in chancery had abundance of evidence to support his finding in the positive denial of the alleged

signers and the surrounding facts. The fact that Mrs. Hickerson wrote letters to some of these persons telling them she had signed their names tends to destroy her claim of prior authority. She did not deny writing these letters.

The testimony of Mrs. Hickerson relative to the signature of H. L. Matthew is very unsatisfactory. If the person whose name appears was H. L. Matthews, then we have his positive denial, without any certainty in her testimony as to his identity. If, perchance, the name "H. L. Matthew" signed was that of another person, then we do not know where such other person lived. Mrs. Hickerson was not sure the name in the directory was Matthew or Matthews. She evidently took the address of Matthews, the witness who testified. Manifestly, the preponderance of the testimony is against the validity of the signature.

III. Each petition, purporting to be signed by legal voters with addresses of the signers and supported by the statutory affidavit of the circulator thereof and filed in the office of the Secretary of State, is prima-facie proof of the genuineness of such signatures, that the persons whose signatures appear thereon live at the addresses given and that such persons are legal voters. [Sec. 5907, R. S. 1919; State ex rel. v. Carter, 257 Mo. l. c. 78.] Such prima-facie character of such petitions continues in the suit to enjoin the Secretary of State from submitting the act to a referendum, until it is overcome by the proof. Prima-facie literally means at first view. In Smith v. Burrus, 106 Mo. l. c. 100, it is defined as "such evidence as in the judgment of law is sufficient to establish the fact, and if not rebutted remains sufficient for the purpose." It is such proof as puts one contending against the truth of such prima-facie showing to his own contrary proof and, in the absence of such contrary proof, is sufficient to establish the fact finally. We quote from Gilpin v. Railway Co., 197 Mo. l. c. 325, as follows:

*Prima-Facie Case.*

"What is a prima-facie case? The following answers have been given to that question: 'A prima-facie case is one which is established by suffcient evidence, and can be overthrown only by rebutting evidence adduced on the other side.' [2 Abbott's Law Dic. 312.] 'A prima-facie case is that which is received or continues until the contrary is shown.' [22 Am. & Eng. Ency. Law (2 Ed.) p. 1294.] Prima-facie evidence. 'It is such as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for the purpose.' [Kelly v. Jackson, 6 Peters, 632.)''

The law presumes right conduct rather than otherwise. It presumes that men will not deliberately commit criminal acts. Applying such presumption concretely, when the circulator of a referendum petition makes the statutory affidavit thereto, the law accepts as true the statements made therein until the contrary is shown. This means that the genuineness of the signatures and the correctness of the addresses given and that the signers are legal voters are sufficiently shown by such affidavit to require the Secretary of State to accept and file the petition and that when any of the facts stated in such affidavit are questioned in court proceedings, those questioning the truth of such statements must produce testimony to overcome such prima-facie case. When such proof is offered, it is the duty of the trier of the facts to determine the fact from all the proof and such fact must be determined like any other issue of fact in a civil case, from a fair preponderance of the evidence.

While this case is one in ·equity, wherein it is our duty to review the evidence and make our own findings of fact, we naturally and properly defer largely to the judgment of the master in chancery, especially

Deference to Master. where, as here, the trial court has approved such finding. The master in chancery saw and heard the witnesses. He could observe their manner while testifying, their confidence and readiness or otherwise

and their apparent interest or want of interest. This point of view is denied us on appeal, We must content ourselves solely with the printed record, stripped of all acts, conduct and facial expressions of the witnesses not susceptible of being reduced to writing. Such acts and conduct persuasively and naturally create belief or disbelief of the testimony in the mind of the trier of the facts who sees and hears the witnesses. They add to or detract from the spoken words. He thus possesses a tremendous advantage in reaching a just conclusion of which we are utterly deprived in studying the cold record.

IV.   Appellants contend that because the Secretary of State has authority to make some determination concerning the sufficiency of referendum petitions for the purpose of ascertaining whether they are entitled to be accepted and filed in his office, his decision is final in the absence of fraud. We do not so understand the provisions of Section 5909. That section plainly provides that if the Secretary of State wrongfully refuses to file petitions, he may be compelled to do so by mandamus. He may have concluded the petitions were invalid or insufficient. The statute provides the remedy for error on his part. Surely in the light of said Section 5909, if the Secretary of State had held, as did the master in chancery and the trial court, that the petitions were insufficient and those seeking to refer the act had moved against him by mandamus, we would hold that his ruling was *not* final. The Secretary of State cannot be enjoined from certifying petitions which are legally insufficient until after such petitions have been accepted and filed by him. [State ex rel. Westhues v. Sullivan, 283 Mo. 546, l. c. 573.] The section referred to clearly implies the right to challenge the insufficiency for any legal reason *after the Secretary of State has approved and filed the petitions.* There may be fraud in the procurement of signatures ap-

*Acceptance of Secretary of State: Absence of Fraud.*

parently legally sufficient and petitions may be found to be legally insufficient which have been signed in the exercise of the utmost good faith and without even suspicion of fraud.

Section 5909, among other things, provides that "on showing that any petition filed" (which necessarily implies that the Secretary of State has then passed on the sufficiency of such petition, so far as he is authorized to approve it) "is not legally sufficient, the court may enjoin the Secretary of State and all other officers from certifying or printing on the official ballot for the ensuing election the ballot title and numbers of such measure." That the preliminary approval of the Secretary of State is in no sense final and the courts are not bound by his decision could hardly be expressed in clearer language. We have examined the cases from other states cited by appellants. They are either not in point or are based on statutes different from Section 5909. As said in the case of State ex rel. v. Carter, 257 Mo. l. c. 78, it is the duty of the Secretary of State to accept and file petitions which are *on their face* legal and sufficient.

"If he refuse to file such petition he may be compelled by mandamus to do so. [Section 6750.] In such mandamus suit the legality of the signers in all respects, the number of the signers, their residences, the genuineness of their signatures and other conditions precedent to legality may be fully threshed out as cold questions of law, upon the proof made on the trial as in any other mandamus suit. If on the other hand the Secretary of State filed a referendum petition which is insufficient by reason of a lack of legal signers, or for lack of enough congressional districts represented, or by reason of forgery or other fraud, he may be enjoined from further action, and thereupon the whole matter of insufficiency from the lack of any requirement of statute or of Constitution, may be judicially examined, determined and adjudged."

295 Mo.—8

The Carter Case was a decision by Court in Banc in which all the judges concurred. We overrule this contention of the appellants.

V. Our conclusion is that the preponderance of the evidence supports the finding of the master in chancery. His finding must be approved as to all of the fifteen names covered by his report and the name of George Meek must also be added to the list, making sixteen names in all which clearly cannot be counted in determining the sufficiency of the petitions from the Fourth Congressional District. Such conclusion necessarily compels us to affirm the judgment below. These sixteen signatures, with nineteen admitted duplicates and one by a person below the legal voting age, make thirty-six alleged signatures which cannot be counted. This leaves said district with only 3508 legal signatures on the petitions filed, or five less than the number 3513 admitted to be the minimum number required, without any consideration whatever of other signatures attacked. These we will proceed to consider briefly.

Duplications: Minor.

VI. What we have already said effectually disposes of the case, but there are other points raised by respondent against the sufficiency of the petitions which we feel constrained to discuss somewhat. They are in the case and squarely before us and are such questions as should be settled. We will not lengthen this opinion in the discussion of questions which we regard as of little importance or such as are not likely to be presented in other cases.

The master in chancery found that thirteen of the signatures to petitions in said Fourth Congressional District were placed on said petitions by other persons without previous authority of the persons whose names were signed thereto. He reported: "All of these thirteen persons 'ratified' the signatures by not objecting to the same when their at-

Ratification.

tention was called to it," etc.  A single instance will
suffice.  We will take the first name on the list appearing
in respondent's brief, Thomas Cox.  Mrs. Hickerson,
circulator, testified that no objection had been made to
her because his wife signed his name.  Etta Cox, his
wife, testified that she signed the name of her husband
in his absence and without his prior knowledge or au-
thority; that she told him three or four days later that
she had signed his name and he made no objection and
said it was all right.

Names signed to referendum petitions under such
circumstances comply. neither with the letter nor the
spirit of the initiative-and-referendum amendment of the
Constitution or the statutes enacted in aid thereof.  We
do not mean to be understood as deciding that under no
circumstances may signatures be attached to such peti-
tions by others than the purported signer.  In the de-
termination of that question the effect of Section 5914
making it a criminal offense for any person to sign any
name other than his own will necessarily need to be
considered carefully.  We do hold that names placed
on petitions under the circumstances appearing in the
case of Thomas Cox are not entitled to be counted on
a petition.  To count names signed without authority
of the purported signer is to open wide the doors of
fraud to opponents of legislative enactments.  This
would provide a means of extending the time limit for
filing petitions as names could be signed at the last
moment and ratification secured afterwards.  To
sanction such a thing is to encourage the unscrupulous
petition circulator (at ten cents a name, perhaps) to
write or have written on his petition the names of people
whom he either has not had time to see or is too lazy to
see.  He might depend upon their friendship toward
himself to secure their consent later, or at least to in-
sure that they will not protest or make complaint which
will result in his criminal prosecution.  No cases need
be cited nor elaborate reasons given in support of this

conclusion.    Any man with normal imagination can speculate as well as we upon the length to which a contrary conclusion would permit unscrupulous opponents of legislative acts to go.   The extent of the names on the poll books and the deterring fear of the penitentiary would be the only limits upon their possible activities. We have no hesitation in holding that the signature of Thomas Cox and those in like case cannot be counted.

VII.   The master in chancery reported a number of instances where the affidavits to petitions were made by persons other than those who secured the signatures and in whose presence the petitions were signed.

Affidavit.   It is not necessary to illustrate from the record, for we understand there is no dispute about the fact, although there may be some disagreement concerning the number of signatures affected by such affidavits.

Section 5908, Revised Statutes 1919, is as follows:

"Each and every sheet of every such petition containing signatures shall be verified in substantially the following form by the person who circulated said sheet of said petition, by his or her affidavit thereon and as part thereof:

"State of Missouri, ⎱ ss.
County of ———. ⎰

"I, ———, being first duly sworn, say (here shall be legibly written or typewritten the name of the signers of the sheet), signed this sheet of the foregoing petition, and each of them signed his name thereto in my presence; I believe that each has stated his name, postoffice address and residence correctly, and that each signer is a legal voter of the State of Missouri and County of ———.

"(Signatures and postoffice address of affiant).
"Subscribed and sworn to before me this ——— day of ———, A. D., 19—.
"(Signature and title of officer before whom oath is made and his postoffice address).

"The forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors."

Said section requires each sheet of every petition to be verified by the person who circulated it by his or her affidavit. The form suggested in said section includes the statements that each of the persons signed the petition in the presence of the affiant, etc. When such affidavit is made in substance, prima-facie proof is made of the facts stated therein. Proof that the affidavit is false in its statement in any particular destroys the prima-facie character of the affidavit in that respect. The affidavit should contain in substance the facts set out in the form suggested in said Section 5908, and the fact that the signature was made in the presence of affiant is one of the substantial facts to be included in the affidavit to make such verified petition prima-facie proof of the sufficiency thereof. Such defects are not merely clerical or technical errors. They are matters of substantial importance. It reasonably follows that, if such petition is challenged when offered in court and it develops under the proof that the affidavit is false in material allegation or any material fact is not therein stated, those asserting the sufficiency of such petition should furnish proof *aliunde* of the necessary facts, such as the testimony of the circulator, for example. It then becomes a question of fact, independent of the affidavit, as to the genuineness of the signatures in question. If the proof shows the signers are legal voters within the district covered by the petition and their purported signatures are genuine, they may be counted; otherwise not. Discussion of the facts shown by the proof in this case is entirely unnecessary, since whatever the facts may be, they will not affect the result we have reached.

VIII. We are not here concerned with the merits of the legislative act sought to be referred. But, when a solemn legislative act is sought to be set aside, it is our duty to see that the constitutional and statutory requirements have been substantially met by those seeking to refer the act. The refer-

Wisdom of Act.

endum is a safeguard against legislation which is deemed unwise and the law must not be so construed as to destroy its effectiveness. On the other hand, full observance of substantial requirements must be exacted lest the referendum be made the instrument of injustice or oppression by a militant and well organized opposition, much less in numbers than the required five per cent of the legal voters in two-thirds of the congressional districts.

IX. We have carefully examined the record covering the evidence affecting the validity of signatures sufficient to determine the issue of fact adversely to the contention of appellants. In our opinion, the preponderance of the testimony establishes the fact that at least sixteen signatures cannot be counted for the referendum, in addition to the twenty which concededly cannot be so counted. The determination of this issue makes unnecessary any detailed examination of the record touching other issues of fact. Such determination necessarily results in the affirmance of the judgment of the trial court and such is our order. *James T. Blair, C. J.,* and *Graves, Higbee* and *Elder, JJ.,* concur.