UNITED LABOR COMMITTEE OF MISSOURI et al., Appellants,

v.

James C. KIRKPATRICK, Secretary of State, Respondent,

and

Freedom to Work Committee, Inc., Intervenor-Defendant-Respondent.

No. 61025.

Supreme Court of Missouri, En Banc.

Oct. 24, 1978.

Rehearing Denied Nov. 7, 1978.

James G. Walsh, Jr., Kansas City, Christopher Graham, Jefferson City, for appellants.

John D. Ashcroft, Atty. Gen., Larry Marshall, S. Joel Wilson, Asst. Attys. Gen., Jefferson City, for respondent.

Cullen Coil, Jefferson City, for intervenor-defendant.

SEILER, Judge.

The issue before this court is whether the circuit court properly found that certain initiative petitions from the 4th, 5th and 6th congressional districts were properly counted by the secretary of state and whether the validity of the signatures on those petitions can be shown by means outside of § 126.061, RSMo Supp.1975, form requisites. The initiative measure in question is proposed constitutional amendment No. 23 (Right to Work) on the November 1978 ballot.

The plaintiffs-appellants (who appeal from the judgment of the circuit court denying their prayer for relief enjoining the defendant secretary of state from submitting the proposal at the coming election) are a labor oriented Missouri not-for-profit corporation and several resident officers of various labor organizations. Freedom to Work Committee, Inc., a Missouri not-for-profit corporation, which sponsored and conducted the campaign to obtain the required number of voter signatures, was permitted to intervene as a party defendant.

Although various deficiencies have been alleged by appellants, we deal only with the question which would be outcome-determinative on the continuance of the proposed amendment on the November ballot. That question involves whether the voter signatures on certain petitions can be shown to be valid (and allowed to be treated as such) despite the fact that the circulator's "affidavit" thereon was affixed outside the presence of the notary, with the notary signa-

ture being added at a later time and despite evidence that certain circulators, not present when the voters signed the petition, nevertheless signed affidavits swearing that they witnessed the signatures.

Section 126.061 first provides as follows: "Each sheet of a petition containing signatures shall be verified in substantially the following form by the person who circulated the sheet of the petition, by his affidavit thereon and as part thereof: . . ."

It provides further that the circulator must attest that each of the signers "signed his name thereto in my presence; I believe that each has stated his name . . . correctly, and that each signer is a qualified voter of the state of Missouri . . ." The circulator/affiant then signs the petition, with such signature being "subscribed and sworn to before" a notary public. Section 126.061 then provides: "The form herein given is mandatory, and if followed in any petition it shall be sufficient, disregarding clerical and merely technical errors." [1]

The mandatory nature of the form is apparent on its face. Prior to 1971, § 126.-040, RSMo 1969, provided that "The forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors."

Under Mo.Const. art. III, § 50, proponents of the amendment were required to gather signatures on the petitions from eight percent of the legal voters of two-thirds of the ten congressional districts of the state, and to submit these petitions by July 6, 1978, four months prior to the November 7, 1978 election at which the amendment was to be voted on.

In April, 1978, the Freedom to Work Committee began the initiative petition campaign. Petitions were circulated thereafter until July 6. The proposed amendment reads as follows:

"Section 29(a). That no person shall be deprived of the right and freedom to work at his chosen occupation for any employer because of membership or non-membership in any labor organization, or because of payment or nonpayment of dues, fees, assessments, or other charges of any kind to any labor organization; and that any contract which contravenes this right is illegal and void."

On July 6, the initiative petitions were filed with the secretary of state for processing pursuant to the provisions of Chapter 126, RSMo Supp.1975.

Between July 6 and August 25, the secretary of state processed these petitions. His certificate issued August 28, 1978, certifying that of a total of 234,305 signatures obtained in the ten congressional districts of the state, 163,000 were valid signatures, which qualified the petitions in eight districts.

Deficiencies in the execution of circulators' affidavits and notarization are alleged in the 4th, 5th and 6th districts. In their petition plaintiffs also allege that the petitions contain forged, fraudulent, fictitious and unauthorized signatures and that some persons signed more than once. We know from the certificates of the secretary of state that he declared some 67,409 signatures to be invalid and of the 163,000 remaining valid signatures, some 50,000 were

---

1. Section 126.061 reads in full as follows:

"Each sheet of a petition containing signatures shall be verified in substantially the following form by the person who circulated the sheet of the petition, by his affidavit thereon and as part thereof:
State of Missouri
County of _____
I, _____, being first duly sworn, say (here shall be legibly written or typewritten the name of the signers of the sheet) signed this sheet of the foregoing petition, and each of them signed his name thereto in my pres-

ence; I believe that each has stated his name, street address and city, town or village correctly, and that each signer is a qualified voter of the state of Missouri and of the _____ congressional district.
Signature and address of affiant.
Subscribed and sworn to before me this _____ day of _____, A.D. 19__.
(Notary seal and signature.)
The form herein given is mandatory, and if followed in any petition it shall be sufficient, disregarding clerical and merely technical errors."

in the 4th, 5th, and 6th districts. There was little, if any, evidence, and the trial court made no finding, of any forged, fictitious or unauthorized signatures among these remaining signatures. In one of the briefs before us, appellants state "[I]n all candor that we do not believe this to be a forgery case, nor do we have any evidence to suggest that the signatures deemed valid by the Secretary of State, acting through the various election officials around the State, do not appear on their respective list of registered voters."

Two types of irregularities were alleged and found to exist by the trial court. First, Betty Miller and Sue Fellows signed as purported circulators numerous petitions which had been signed by registered voters outside their presence. Most of these petitions were received through the mail. Both women were full time office employees in the Freedom to Work office in Kansas City, and according to depositions of fellow workers did not work outside the office during office hours. Sue Fellows' name appeared on 170 petitions as circulator, with petitions coming from all three districts.

Betty Miller's name appeared on 257 petitions as circulator, also with petitions from all three districts in question. A total of 1,681 signatures in the 4th district, 321 in the 5th district, and 855 in the 6th district were involved in the 427 petitions signed by these two women. However, even if all of the petitions signed by Sue Fellows and Betty Miller were declared invalid, there would still be enough valid signatures in each district to keep the amendment on the ballot.

The second allegation of deficiencies, however, if resulting in invalidation of the petitions, would be sufficient to take the amendment off the November, 1978 ballot. The evidence showed that Stanley I. Dale, III, worked for Freedom to Work Commit-

tee in their Kansas City and Jefferson City offices as notary. It is charged that Dale notarized circulators' signatures on some 1,538 petitions at times when the circulators were not in his presence. Plaintiffs' proof on this point consisted of the testimony mostly by deposition of seventy-two petition circulators who in almost every instance testified that they signed the petitions outside Dale's presence, although the petitions when filed bore Dale's signature and notarial seal. These 1,538 petitions contained 12,960 signatures and if ruled invalid would eliminate 3,280 names in the 4th district, 6,171 in the 5th district and 3,509 in the 6th district. If so, the initiative petitions would be short the necessary eight percent of the voters in the required two-thirds of the congressional districts.

■ The petitions in question were actually before the trial court.[2] They bore on them the corroborative markings placed thereon by the local election officials when being checked against the local registration records, upon request by the secretary of state under the authority given him by § 126.081.2, RSMo Supp.1975 to consult the public records, including voter registration records,[3] in determining the validity of the voter signatures upon the petitions.[4]

The parties stipulated as to the procedures used by the secretary of state and the instructions which he issued to the local election authorities for checking signatures against voter registration. The local authorities were to check the signatures against the signatures on the registration record. They were cautioned to be on the lookout for apparent forgeries, duplicate signatures, printed signatures, husbands and wives signing for each other, or husbands and wives signed on one signature line as "Mr. and Mrs." At the bottom of each page they were to total the number of signatures checked and to indicate the num-

2. No issue is raised on appeal as to the admissibility of this evidence.

3. Signers of initiative petitions must be registered voters. *Scott v. Kirkpatrick*, 513 S.W.2d 442 (Mo. banc 1974).

4. The fact that Section 126.081 permits the secretary of state to consult voter registration records refutes the argument that the Section 126.061 form is the "only" statutory check on the validity of the signatures.

ber of registered and nonregistered signatures. The local officials returned the petitions to the secretary of state's office, with their written certificate as to the signatures checked and the number of registered voters eligible to vote. These markings and totals on each page of the petitions can easily be seen on the copies of the petitions which were before the trial court. It was after this checking had been completed that the secretary of state issued his certificate as to the number of valid signatures on the petitions per congressional district. It is abundantly clear therefore, under the record, that there is evidence to support the finding of the trial court that the signatures were genuine.[5]

The real dispute is over the effect of the improper signing of certain petitions by circulators who, in fact, did not witness the signing of the petitions by the voter, and the improper notarization of various petitions by Mr. Dale (he notarized the signatures of various circulators to their petitions without the affiants being before him). It is important to note that the conduct involved is not of the type in which signatures are forged, fictitious names are signed, or other dishonest devices used to obtain signatures on the petition. Nor is any misconduct charged or attributed to the voters themselves.

Although the circuit court recognized both the irregularities with the alleged circulators and with Dale's notarization, the court nonetheless found the petitions valid because the underlying petition signatures were found to be valid and genuine.

■ When irregularities in circulator affidavits or notary attestations are found, those irregularities rebut the prima facie validity of the petition (in accord with § 126.061). The burden is then shifted to the proponents of the signatures of the petition signers to show the underlying validity of those signatures. The underlying validity of the signatures was shown through voter registration list checks as set forth above, as well as by testimony of circulators who testified by deposition and in person. We thus affirm the circuit court ruling, which has the effect of continuing the proposed amendment on the November 1978 ballot.

■■ While we appreciate the requirements of circulator affidavits and notary verification, we should look to the purpose of that affidavit and of that verification. The rationale behind initiative amendments is that a sufficient number of registered voters deem an issue important enough that the issue should be put to a vote before the people. The assertation of this constitutional right by the required number of legal voters should not be lightly cast aside. *State ex rel. Voss v. Davis,* 418 S.W.2d 163 (Mo.1967). As *Kasten v. Guth,* 395 S.W.2d 433, 435 (Mo.1965) states: "The uppermost question . . . is whether or not the statute itself makes a specified irregularity fatal . . . If not, courts will not be astute to make it fatal by judicial construc-

5. As stated, plaintiffs took depositions of 72 petition circulators whose petitions were notarized by Mr. Dale. In cross-examination of these witnesses, the defendants brought out that the witnesses, as petition circulators, had in fact witnessed the signing of the petitions by those whose signatures appeared thereon. In many instances, the defendants also brought out on cross-examination that the witnesses had asked if the signer were a registered voter, etc. Defendants contended that any failure to swear to these essentials before notary Dale was cured by the subsequent statements given under oath in the deposition covering the same points as would have been covered had the petition been properly sworn to in the first place. Plaintiffs contend that deficiencies in circulators' affidavits cannot be remedied by subsequent proof. However, *Kaesser v. Becker,* 295 Mo. 93, 243 S.W. 346, 352 (banc 1922) holds directly to the contrary, stating: "It reasonably follows that, if such petition is challenged when offered in court and it develops under the proof that the affidavit is false in material allegation or any material fact is not therein stated, those asserting the sufficiency of such petition should furnish proof aliunde of the necessary facts, such as the testimony of the circulator, for example . . ." We do not see where the 1971 statutory change making use of the prescribed circulator's oath form mandatory changes the rules set forth in *Kaesser* above, as the purpose of the change would appear to be for the convenience of the secretary of state in checking petitions, as discussed later herein.

tion", citing *Bowers v. Smith,* 111 Mo. 45, 20 S.W. 101, 103 (1892), that construction "of a law as would permit the disfranchisement of large bodies of voters, because of an error of a single official, should never be adopted where the language in question is fairly susceptible of any other." In accord with this theory, the 12,960 registered voters who suffered the happenstance of having signed the petitions which were subsequently improperly notarized by Stanley I. Dale, III, should not have their signatures invalidated due to the conduct of Mr. Dale.

The issue is not whether a particular notary deems what he is doing important enough to comply with the technicalities of the statute by making sure that each circulator signs in his presence. To allow form to rule over substance is to permit the failure of the notary, whatever his reason, to defeat the initiative submission in spite of the fact that the proper number of voters have done all they can to comply with the initiative procedure. The only statutory purpose in having a notary sign the petition to begin with is to provide a double check on the validity of the signatures of the voters. If the validity of the voters' signatures can be otherwise verified, their signatures should not be invalidated by the notary's negligence or deliberate misconduct.

Previous decisions of this court have discussed the importance of the initiative and referendum, emphasizing that procedures designed to effectuate these democratic concepts should be liberally construed to avail the voters with every opportunity to exercise these rights. The ability of the voters to get before their fellow voters issues they deem significant should not be thwarted in preference for technical formalities.

In *State ex rel. Voss v. Davis,* 418 S.W.2d 163 (1967), a time expansion had been granted to permit proponents of a city charter amendment ten additional days to gather sufficient signatures to place the initiative measure on the ballot. In that decision we declared that:

"We should not apply the provisions . . . relating to the sufficiency of petitions as though they were 'a rule in a checker game, where once your hand is off the man the move is final', but rather should apply them so as 'to give all who actually desire the passage of the proposed measure every opportunity to obtain the required number on a petition . . .'" *Id.* at 167.

We do not mean to imply that the time mandated by the constitution should be expanded in the case of state-wide initiative, but we do see a parallel in the significance of the initiative in our democratic heritage. In drawing that parallel we noted in *Voss* at 167 that:

"In the matter of charter amendments by petition, as in initiative and referendum, the people are exercising power reserved to them and the provisions under which they proceed should be construed liberally to the end that their right to determine all proper questions by free and open elections shall be secure. 'Provisions reserving to the people the powers of initiative and referendum are given a liberal construction to effectuate the policy thereby adopted. Such provisions should be construed so as to make effective the reservation of power by the people', 28 Am.Jur., Initiative, Referendum and Recall, Sec. 6, p. 439."

See also *State ex rel. Walhmann v. Reim,* 445 S.W.2d 336, 341 (Mo. banc 1969); *State ex rel. Ford v. Brawley,* 514 S.W.2d 97, 99 (Mo.App.1974); *State ex rel. Ferro v. Oellermann,* 458 S.W.2d 583, 586 (Mo.App. 1970).

The initiative power set forth in art. III, § 50 of the Missouri Constitution is broad and is not laden with procedural detail. The form in question in the present case is not mandated by the Constitution, but is instead provided for by statute. In comparable situations we have said:

"[L]egislation 'cannot limit or restrict the rights conferred by the constitutional provision.' *State ex rel. Elsas v. Missouri Workmen's Compensation Commission,* supra [318 Mo. 1004, 2 S.W.2d 796, 801]. In *State ex rel. City of Fulton v. Smith, State Auditor,* supra [355 Mo. 27, 194

S.W. 302, 305], we said: 'Minor details may be left for the legislature without impairing the self-executing nature of constitutional provisions . . . but all such legislation must be subordinate to the constitutional provision, and in furtherance of its purposes, and must not in any particular attempt to narrow or embarrass it.' In a contest between the two if the statute *restricts a right* conferred by the Constitution, the latter prevails . . ." *State ex rel. Randolph County v. Walden*, 357 Mo. 167, 206 S.W.2d 979, 986 (Mo. banc 1947).

This reasoning applies equally to the initiative process. While it is true that we have held the absence of an enacting clause fatal to an initiative attempt, such enacting clause is required by the Missouri Constitution in art. III, § 50, and not by statute, *see State ex rel. Scott v. Kirkpatrick*, 484 S.W.2d 161 (Mo. banc 1972). We find this distinction significant. The initiative process is too akin to our basic democratic ideals to have this process made unduly burdensome.

Art. III, § 50 of the Missouri Constitution makes clear that, in determining whether initiative petitions are sufficient, a primary question is whether they contain the signatures of "eight per cent of the legal voters in each of two-thirds of the congressional districts in the state." The Constitution does not require circulators' affidavits or notaries' jurats. The latter requirements have been engrafted onto the initiative process by statute. These requirements have a role in the initiative validation process, but they are not the ultimate determining factors. The validity of the signatures is the heart of the ultimate determination.

In *Whitman v. Moore*, 59 Ariz. 211, 125 P.2d 445, 453 (1942), [overruled in part, but not as to proposition for which here cited, in *Renck v. Superior Court of Maricopa County*, 66 Ariz. 320, 187 P.2d 656, 660 (1947)], the Arizona court was faced with the question of "What is the effect if the petitioner or verifier fails to comply fully with the formal requirements of the constitution?" In response, the court concluded:

"The ultimate substantive question obviously is whether the signer is in all respects a qualified elector, and all the requirements in regard to residence, date of signing, verification and the like are to assist interested parties to ascertain this fact. . . . the effect of a deviation from the constitutional requirements in any of these particulars as to the manner of furnishing the necessary information by either petitioner or verifier is *not to make the signature void, but to destroy the presumption of validity,* and place upon the one desiring to sustain the signature the *burden of proving* by evidence aliunde the petition that the *signer was qualified in all respects.*" [emphasis added.]

A fortiori, the same would be true as to statutory requirements such as found in Section 126.061. When the Arizona court addressed the question as it related to the lack of notary certificate or certification of verification, the court again concluded that, although the prima facie validity was destroyed, the irregularity did not make the signatures invalid if "it be affirmatively shown that the [signers] were qualified electors." *Whitman* 125 P.2d at 455. See to the same effect *Kaesser v. Becker*, 295 Mo. 93, 243 S.W. 346, 352 (banc 1922), quoted in footnote No. 5, *supra*, and *State ex rel. Ferro v. Oellermann*, 458 S.W.2d at 587; *Fleming v. Fones*, 230 Mo.App. 1147, 91 S.W.2d 208, 212 (1936).

The same rule applies in other jurisdictions. *See, e. g., In re Initiative Petition No. 272*, 388 P.2d 290, 293 (Okl.1964); and in particular *State ex rel. Carson v. Kozer*, 105 Or. 486, 210 P. 179, 183 (1922), which was quoted and relied upon by the trial court in the case at bar as follows:

". . . The end sought to be attained is the signing by a sufficient number of legal voters. The affidavit of the circulator and the certificates of county clerks and notaries public are mere forms and evidence designed to accomplish the end sought to be attained. The affidavit and the certificates are forms, while the signatures of legal voters are the substance.

". . . Genuine signatures of legal voters constitute the vitalizing element of a petition, and all else is mere form and evidence. Even though the prima facie quality of the evidence . . . is destroyed, . . . there yet remains a petition sufficient in form, and if the petition is in truth signed by a sufficient number of legal voters, it is a legally sufficient petition . . . Impeachment of the evidence furnished by the certificate does not foreclose inquiry concerning the truth; and the truth can be learned only by a consideration of all available evidence relating to the genuineness of the signatures."

See also *Petition of Smith,* 114 N.J.Super. 421, 276 A.2d 868, 872–73 (1971), and *Pafford v. Hall,* 217 Ark. 734, 233 S.W.2d 72, 73–74 (1950).

We next address the issue of whether the change in statutory language in 1971, making the form mandatory rather than suggestive, has any effect on the standard which permits proponents to demonstrate the underlying validity of the signatures once the prima facie validity of the form has been refuted. We find the standard does not change.

Prior to 1971, Section 126.040, RSMo 1969 provided that "[t]he forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors." That provision was superseded in 1971 by the language earlier set forth, stating that "[t]he form herein given is mandatory, and if followed in any petition it shall be sufficient, disregarding clerical and merely technical errors." The form in both instances required signature of the circulator, attesting that the signers signed in his presence, with the notary attesting that the circulator signed in his presence.

In *Kasten,* 395 S.W.2d at 435, the votes were not invalidated by the absence of judges' or clerks' initials and black stickers over the numbers (requirements mandated by Section 111.620, RSMo 1959), with the statutory language requiring that "it *shall* be the duty of the election judges . . .

to cover or conceal securely the identifying number . . ." and "[n]o judge of election *shall* deposit any ballot upon which the names or initials of the judges . . . do not appear" (emphasis supplied). To reiterate in *Kasten,* the court concluded that " 'The uppermost question in applying statutory regulation to determine the legality of votes . . . is whether or not the statute itself makes a specified irregularity fatal. If so, courts enforce it to the letter. If not, courts will not be astute to make it fatal by judicial construction.' " *Id.* at 435. We cannot give the "shall" or "mandatory" language in Section 126.061 greater importance, in the absence of express statutory language declaring that petitions which fail to comply with the requirements shall not be counted.

A recent decision where the statute did make the defect in an affidavit fatal illustrates the point further. In *Barks v. Turnbeau,* 573 S.W.2d 677, the court of appeals, St. Louis district, Nos. 40661 and 40662 (September 12, 1978), found irregularities in absentee ballots to be sufficient to invalidate the ballots. Two distinctions from the present case are noteworthy. First, in *Barks* it was the voters themselves who were to adhere to the statutory procedures and not merely a private third party. Second, a specific remedy has been provided in Section 115.295, RSMo Supp.1977 to deal with the situation of a faulty absentee ballot affidavit. That remedy is that "the absentee ballot . . . be rejected." Section 126.061 has no provision describing the remedy to be imposed if the form is not followed completely.

The purpose of the 1971 change was to make checks on the prima facie validity of the petitions easier for the secretary of state by having a uniform form. Plainly the requirement of a uniform style of petition will be of great assistance to the secretary of state in checking thousands of such documents. It in no way requires that irregularities in the circulators' or notary's signatures be treated fatal to the petition.

This court does not condone the improper signing by circulators of initiative petitions

or of affidavits by a notary public. The legislature has made it a crime punishable by up to two years in the penitentiary for any officer or person willfully to violate any provision of Chapter 126. Section 126.151, RSMo Supp.1975. The remedy, however, is criminal proceedings against those who swore false oaths or otherwise violated applicable statutes and not by nullification of the good faith subscription by the voters to the petitions. A small number of people abused the statutory process provided for the people to exercise their constitutionally reserved right of initiative by presenting the secretary of state with certain improperly notarized petitions. These actions of third parties involved in the initiative process should not operate to deny the larger body of honest persons who have done all they can do to place this measure on the November ballot the opportunity for its submission to the entire electorate.

The judgment of the trial court is affirmed.

FINCH, DONNELLY and RENDLEN, JJ., concur.

MORGAN, C. J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents in separate dissenting opinion filed and concurs in dissenting opinions of MORGAN, C. J., and SIMEONE, J.

SIMEONE, J., dissents in separate dissenting opinion filed and concurs in dissenting opinions of MORGAN, C. J., and BARDGETT, J.

MORGAN, Chief Justice, dissenting.

Misconduct described in the present case should not be tolerated. I cannot agree with the majority that the evidence in the record did not demonstrate fraud in the present case; nor can I agree that § 126.061, RSMo 1975, is mandatory solely in form or that the genuineness of the petition signers' signatures is the only important element required by Chapter 126. Procedures set forth in Chapter 126 are not unduly burdensome on the initiative process, but are instead designed to safeguard it.

The statutory language of § 126.061 is mandatory and cannot be ignored. It provides that:

> "[E]ach sheet of a petition containing signatures shall be verified . . . by the person who circulated the sheet of the petition, by his affidavit thereon and as part thereof."

The circulator must attest that each of the signers "signed his name in my presence; I believe that each has stated his name . . correctly . . . and that each is a qualified voter of the state of Missouri . . ." The circulator/affiant then signs the petition, with such signature being "subscribed and sworn to before" a notary public. Section 126.061 then provides that "[T]he form herein given is mandatory, and if followed in any petition it shall be sufficient, disregarding clerical and merely technical errors."

The mandatory nature of the form is apparent on its face. Prior to 1971, RSMo 1969, § 126.040 provided that "[T]he forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors." RSMo 1939, § 12888. Legislative intent is clear. The form now must be used and must be followed. To have the wording of the form be mandatory, but allow circulators and notaries to disregard the oaths in that form would be to yield the mandatory nature of the form an exercise in futility.

Two types of irregularities were alleged and found to exist by the trial court. First, it is alleged that Betty Miller and Sue Fellows signed as alleged circulators numerous mail-in petitions. Both women were full time office employees in the Freedom to Work office in Kansas City and according to depositions of fellow workers did not work outside the office during office hours. These districts in which the two women purportedly served as circulators stretched from the Iowa border to southern Missouri.

Sue Fellows' name appeared on 170 separate petitions as circulator, with petitions coming from all three districts. Of the 26

petitions from the Fifth District signed by Sue Fellows on June 15 alone, deposition evidence indicated 10 petitions (for 565 signatures) were either mailed or circulated by someone other than Ms. Fellows. Most of the other petitions were single family petitions or petitions with a small number of signatures. Numerous petitions had the name of the original circulator scratched out, with Sue Fellows' name inserted in its place.

Betty Miller signed 257 petitions (for a total of 1,116), with 64 petitions from the Fourth District, 77 from the Fifth District and 116 from the Sixth District. Of the 65 people deposed, 52 could be characterized as mail-ins. A total of 1,681 signatures; 505 in the Fourth District, 321 in the Fifth District, and 855 in the Sixth District were involved in the 427 petitions signed by these two women. Because of the highly professional organization of the Freedom to Work Committee, it is apparent that this pattern indicated common practice to swear false affidavits. Ms. Fellows refused to testify and plaintiffs were unable to locate Ms. Miller.

An illustration of the attitude of Freedom to Work Committee (as to compliance with § 126.061) appears in the testimony of the witness, Donald C. Love. He noticed in the Jefferson City office that signed petitions were being received in the mail and he urged those in charge to return the petitions or otherwise take steps to see if they could get the circulator "back in front of a notary." The response of the person in charge of the office was: "F___ it! It's not important." What these Freedom to Work Committee workers fail to understand is that: "There is, of course, no affidavit unless there was an actual swearing to the facts which it purported to affirm under oath." *Sears, Roebuck and Co. v. Hubert*, 352 S.W.2d 382, 385 (Mo.App.1961); *Accord, State ex rel. Knapp v. Cowan*, 230 Mo.App. 226, 88 S.W.2d 424 (Mo.App.1935).

The second allegation of fraud is in and of itself sufficient to take the Right to Work Amendment off of the November, 1978, ballot. It is alleged that Stanley I.

Dale III notarized 3,625 petitions for a total of 26,940 signatures. Of these signatures, 8,009 were from the Fourth District, 10,573 from the Fifth District, and 8,358 from the Sixth District. It is alleged that Dale did not witness the circulators' signatures (as required by RSMo 126.061), but instead "cleaned up" the petitions by notarizing them after they had been signed and submitted by circulators when such circulators were not in his presence at the time of signing. Seventy-two petition circulators admitted Dale had not notarized their 1,538 petitions in their presence. These 1,538 petitions contained 12,960 signatures! Irregularities cited by the United Labor Committee would eliminate 3,280 names in the 4th District, 6,171 in the 5th District and 3,509 in the 6th District, the result of which would be less than the minimum vote requirement in each of the three districts. The margin over the minimum signatures required in these districts is as follows: 1,962 in the 4th, 3,120 in the 5th, and 1,597 in the 6th. The trial court concluded that the evidence demonstrated these petitions (on their face) appeared to be in full conformity with the statute, but were in fact not executed in compliance with the statutory provisions.

Although the circuit court recognized both the irregularities with the alleged circulators and with Dale's notarization, the court nonetheless found the petitions valid because the underlying petition signatures were found to be valid.

The petitions must stand or fall in their entirety. Finding them not only inadequate, but also legally improper, I must dissent.

A legally sufficient petition must contain all essential elements *at the time said petition is filed with the Secretary of State.* An initiative petition that does not contain all the required elements *when filed* is simply not a petition within the meaning of the Constitution or statutes and cannot be made so by the subsequent attempts of the petition sponsors after filing. In this case the filing of the initiative petitions took place on July 6, 1978, the constitutional

deadline. Therefore, these initiative petitions must stand or fall as of that date.

Section 126.061 establishes four separate, distinct and mandatory elements of a legally sufficient petition:

1. Petitions must be signed by registered voters.
2. Petitions must be signed in the presence of a circulator.
3. Petitions must contain a valid circulator's affidavit.
4. Petitions must be properly notarized.

While element one is quite important, I cannot agree with the majority that it is the *only* compelling element. Each of the four elements is mandated by the statute. The simple truth is that the majority opinion eliminates the latter three notwithstanding restrained efforts to suggest otherwise.

Evidence was offered to prove that certain petitions were signed outside the presence of a circulator, that certain petitions were not properly notarized, and that both of these categories *a fortiori* did not contain a valid circulator's affidavit. While the statute excuses clerical and technical errors (and perhaps even inadvertent errors), fraud as to any one of the four elements vitiates the validity of the entire petition.

Section 126.061 was enacted pursuant to constitutional mandate, providing the procedure whereby the people may amend the fundamental law of this state. It is a serious matter, not to be accomplished in a haphazard or casual manner. The purpose of these statutes is to prescribe the necessary procedures to be followed so as to safeguard against fraud, abuse and mistake. The formality of the affidavit requirement is expressly directed to this end.

Statutory safeguards against fraud and abuse, generally, are by their very nature deemed to be mandatory and not directory. See 82 C.J.S. *Statutes* § 376. Such requirements must be mandatory because they not only preserve the integrity of both the initiative and amendment process but also safeguard the right of initiative for the benefit of all the people.

Second, a consideration of the other terms and provisions of the initiative provisions further compels the conclusion that the affidavit requirement is intended to be mandatory. Section 126.081 provides that the Secretary of State shall examine the petitions to determine that they comply with the provisions of the Missouri Constitution and statutes. In reviewing the Secretary's duty in this regard, counsel for the Secretary of State repeatedly emphasized in his opening statement that:

"As to the procedures that he followed once the petitions were received in terms of looking at them, we take the position *he has no obligation*, Your Honor, *legally to look behind the individual signature of the circulator; to look behind the signature of the notary public.*

"We take the position that if the petition is presented to the Secretary of State, and if that petition, on its face, is prima facie valid; then, the Secretary of State has the authority by statute to commence the count of those signatures. Now, in the course of counting those signatures he *may* by statute look to local records that may exist relative to the registration of voters."

The following appears to be standard practice for the Secretary of State:

(Stipulation No. 7)

"(1) The staff of the Notary Commissions Office of the Secretary of State then checked each original petition page as to the proper notarization of said petition page. This check includes

"a. Whether a person had signed the affidavit at the bottom of each original petition page as the circulator.

"b. Whether the notary had signed the affidavit on each original petition page.

"c. Whether the notary seal was affixed on each original petition page.

"d. Whether the notary's commission had expired prior to the notarization of the petition page.

"(2) Unless each requirement a through d above existed, the signatures

on that original petition page were not counted."

The Secretary's procedure results in the signatures of admittedly registered voters being *thrown out* for any *one* of the four reasons stated. This procedure can only be explained by the fact that the Secretary fully recognizes that § 126.061 is mandatory and that it establishes indispensable elements of a legally sufficient petition—a circulator's affidavit and proper notarization. A petition, with valid signatures, that had not been signed by a circulator or had not been notarized would not be accepted by the Secretary of State. Valid signatures of qualified voters do not serve to resurrect a petition otherwise fatally defective. Unfortunately, in the instant case the petition sponsors succeeded in deceiving the Secretary of State by attaching counterfeit affidavits and notarizations to the petitions. Sadly enough, under the Circuit Court's holding, a petition sponsor who through good faith error, but acting honestly, presented petitions with valid signatures but blank circulated affidavits or blank notarizations to the Secretary of State would have his petitions thrown out; whereas, a petition sponsor who attaches counterfeit circulator affidavits and notarizations gets his petitions counted as valid by the Secretary of State *and* the court. This is not just.

The Circuit Court was erroneous in allowing the Secretary to look behind the petitions to find the validity of the signatures to be sufficient compliance with the statute when the circulators' affidavit and/or notary's verification were improperly executed.

Testimony at the trial court was to the effect that:

"*We do not believe that the Secretary of State has a legal obligation,* Your Honor, *to in fact determine by looking behind the signature as to whether or not each individual signature of a registered voter is forged or fraudulent. He may do so if he sees fit, but we would suggest to the Court that the time constraints within which the Secretary of State operates makes it practically impossible for him to*

*in fact take whatever steps would be necessary to check each individual signature,* when you realize that there are some two hundred and thirty thousand signatures, or thereabouts, that were submitted on these various petitions." (Emphasis supplied.)

The above analysis of the Secretary's responsibilities supports the conclusion that the affidavit requirement is mandatory. Specifically, the Circuit Court stated:

"The Secretary was entitled to, and did, rely on the *prima facie* validity of the petitions submitted."

This means, of course, that the Secretary of State is perfectly free to simply count signatures on petitions—with no reference to voter registration lists—and certify the results of his count, even though the signatures in the present case were checked against voter registration lists. The result would then be that each petition signed would appear to be registered because of the *prima facie* validity of the petitions, and counted without any determination having been made as to the *genuineness* of the signature. Under these circumstances it would be a simple matter for an unscrupulous circulator or group of circulators to determine by a telephone call or through the mail whether a person is registered and then sign said person's name to a petition. Theoretically, the Secretary of State, taking the petitions at face value, would count the signatures thereon, when, in fact, the signatures would be forged. Obviously, what could be done by a single circulator, could be done by a well-organized and well-financed group on a massive scale.

Within this framework and under these circumstances, the critical mandatory nature of the affidavit requirement becomes apparent. The verification of the circulator attests to the Secretary of State that the signatures contained on the petitions are genuine in that they were signed in the circulator's presence and that the person who signed the petition stated that he was a registered voter at the time he so signed. Upon receipt of a *verified* petition, the Secretary then attempts to determine the num-

ber of registered voters that appear on said petition. As previously noted, such determination may or may not include a determination as to the genuineness of each signature. Clearly, the legislature intended that the affidavit requirement, whereby circulators verify that the signatures were placed thereon in their presence and that by this sworn statement the circulator would be the subject of a possible perjury prosecution, would provide the realistic mechanism to eliminate fraudulent signatures and would eliminate the probability of a large number of names being placed on petitions by a few people. See *Williams v. Butler*, 35 Ill.App.3d 532, 341 N.E.2d 394 (1976). Affidavits by Sue Fellows and Betty Miller, as alleged circulators on mail-in petitions, are contrary to the statutory intent.

The legislature realized that the affidavit not only constituted the first safeguard, but could constitute the *only* safeguard as to the genuineness of the signatures contained on initiative petitions because of the absence of any express statutory language specifically compelling the Secretary of State to verify by independent check the genuineness of each and every signature on a petition. Indeed, to the extent that one realizes that the Secretary's duty in this regard is permissive only, the mandatory nature of the circulator's affidavit becomes that much more compelling.

An interpretation that deemed the affidavit requirement permissive would not only render the statute meaningless, but would emasculate the entire statutory framework enacted by the legislature to safeguard the constitutional right of initiative.

It is a well settled rule of statutory construction that in ascertaining the legislative intent as to the applicability or effect of a statute, the courts should give effect to the plain and ordinary meaning of the language used. In this case, the use of the word "shall" in the first paragraph manifests a clear and certain intent that the affidavit requirement contained in § 126.061 is mandatory, especially in the absence of any language, express or implied, that in any way qualifies, limits or modifies the mandatory impact intended. Generally, the use of the word "shall" is indicative of a mandate calling for compliance. *State ex rel. Scott v. Kirkpatrick*, 484 S.W.2d 161, 164 (Mo. banc 1972); *State ex rel. Dreer v. Public School Retirement System*, 519 S.W.2d 290 (Mo.1975); *Howard v. Banks*, 544 S.W.2d 601 (Mo.App.1976); *State v. Paul*, 437 S.W.2d 98 (Mo.App.1969). Moreover, not only does § 126.061 dictate that there shall be a verification by affidavit, but it now specifically sets out the *mandatory* form to be followed. The inclusion in this Section of a mandatory form further supports the proposition that this is a mandatory provision, for it would make little sense to provide a mandatory form if the underlying duty or requirement were otherwise. This would be absurd.

The mandatory nature of the affidavit requirement is recognized by the Missouri courts. In *Kaesser v. Becker*, 295 Mo. 93, 243 S.W. 346, 352 (banc 1922), the Supreme Court stated in discussing the verification requirement:

"We are not here concerned with the merits of the legislative act sought to be referred. *But, when a solemn legislative act is sought to be set aside, it is our duty to see that the constitutional and statutory requirements have been substantially met by those seeking to refer the act.* The referendum is a safeguard against legislation which is deemed unwise and the law must not be so construed as to destroy its effectiveness. On the other hand, *full observance of substantial requirements must be exacted lest the referendum be made the instrument of injustice or oppression by a militant and well-organized opposition . . . .*" (Emphasis supplied.)

*Kaesser* was decided prior to the legislature's amendment making the form of the affidavit mandatory. As persuasive as the above language is, it is even more compelling today in light of the legislature's amendment of the affidavit requirement. Even *Kaesser* implied that the standard which permitted the proponents with an

opportunity to demonstrate the validity of the signatures by outside means only applied when no fraud existed. Here we have what I consider to be massive fraud.

Presence before the officer administering the oath is an essential element of a valid affidavit. Where an affidavit is subscribed and sworn to out of the presence of the officer signing the jurat, who neither administers the oath nor sees the subscribing witness, the affidavit is invalid. 2A C.J.S. *Affidavit* § 30.

A verification is a confirmation or substantiation of the correctness, truth or authenticity of something already done, which must include *both an actual swearing by the affiant and the certification thereto by a notary or other officer authorized by law to administer oaths.* 92 C.J.S. *Verifications.*

As declared in 48 Corpus Juris, 855: "*to constitute a valid oath, . . . there must be, in the presence of a person authorized to administer it, an unequivocal act by which affiant consciously takes upon himself the obligation of an oath.*"

As the undisputed evidence demonstrated, and as the Circuit Court found, initiative petitions from the Fourth, Fifth and Sixth Congressional Districts were not properly notarized by the notary; and, therefore, did not contain lawful and valid circulators' affidavits. Although the circulators' affidavits had been filled in, and appeared to be properly notarized, they were, in reality, *legally blank.* In light of its determination regarding the facts and the applicable law, the Circuit Court clearly erred in failing to declare said petitions legally insufficient.

Fraud, be it legal or actual, negates the entire petition. See *Elliott v. Hogan,* 315 S.W.2d 840, 848 (Mo.App.1958). The fact that cases following the *Elliott* rationale are cases of voter fraud (as opposed to fraud on the part of another official vital to the election process) should not distinguish this case.

The legislature in no uncertain terms has expressed its intention that the affidavit requirements are mandatory and absolute.

An initiative petition must have attached the circulator's valid and lawful affidavit at the time it is offered for filing. Nothing more is required; nothing less constitutes compliance. Had the legislature intended otherwise, it could have so provided. This conclusion is supported not only by the express language of the statute, but also by consideration of its stated purpose and the subject matter to which it relates. For any court to conclude otherwise, places it in the untenable position of totally disregarding the clear and unambiguous language of the statute, as well as the purpose and intended effect of the statutory requirement.

The will of the people is broader than the concept of initiative. Just as initiative is seen as the vehicle through which a sufficient number of voters can present an issue they claim important to the populous for a vote, the procedures established to make that initiative process function are procedures instituted at the will of the people through their legislative representatives. These procedures are designed to insure that the will of the people is not easily subverted. To allow the statutorily mandated procedures to be ignored invites haphazard amendment of our Constitution—a phenomenon which ultimately thwarts the will of the people. I am not denying Right to Work proponents their opportunity to present the issue for a vote of the people; I am merely concluding that they must comply with statutory procedures. If the Right to Work proponents comply with initiative procedures by gathering, certifying and verifying the proper number of signatures in accord with statutory requirements, their issue could come before the people for a vote in a future election. We should not sanction the presentation of this issue before the voters in the present election, because sufficient petitions exist only if we count many which were fraudulently prepared.

BARDGETT, Judge, dissenting.

I dissent and concur in the dissenting opinions of Morgan, C. J., and Simeone, J. To those dissents I add the following.

The principal opinion is internally contradictory. The statute cited therein, sec. 126.-061, which sets forth the manner by which signatures must be obtained, also sets forth those "irregularities" which shall *not* invalidate the petitions (signatures) and those are "clerical and merely technical errors". It would seem obvious, therefore, that the clear legislative intent and purpose is that if the "irregularities" are not "clerical or merely technical" the petitions (signatures) are invalid and cannot be received or used by the Secretary of State as valid petitions. They are simply nonfileable. The facts as set forth in the principal opinion and the dissents tell *what* the factual deficiencies were and all opinions recognize them to be substantial in number and totally contrary to sec. 126.061.

The principal opinion says at p. 453 that it is important to note that "dishonest devices [were not] used to obtain signatures on the petitions." Yet that same opinion points out that the petitions upon which the names of Betty Miller and Sue Fellows appear as solicitors are petitions on which none of the signatures were obtained by either Fellows or Miller, and it is further a fact that the notarization was also a fraud. Sue Fellows was regional coordinator for Freedom to Work Committee in Kansas City. She still held that position when her deposition was taken and, as such, refused to answer questions with respect to her work as coordinator of that committee on the grounds that her answers may incriminate her. These petitions numbered 427 and contained 2857 signatures. On the face of the principal opinion, these signatures were admittedly obtained by *illegal* methods—they were not obtained in conformity with sec. 126.061; but somehow the principal opinion concludes that although totally illegal it was not dishonest and, therefore, it not being dishonest, although illegal, it becomes *relatively unimportant.* If there is a valid distinction, whatever it may be, it hardly seems applicable here. That is because the act of obtaining signatures in the way Fellows and Miller did it is, on its face, illegal. Even if "dishonesty" is a subjective matter, it is perfectly obvious that Fellows

and Miller *knew* they were acting illegally and, therefore, dishonestly because they attested to an act they *knew* they had not performed. Now that is dishonesty by any standards and for the principal opinion to say it is not so is to simply, by edict, say that black is white. It just does not make it so.

Furthermore, the facts as stated in the principal opinion conclusively show that the persons who signed petitions upon which the names of Fellows and Miller appear as circulators actually and knowingly did participate directly in the illegality. This is so because the very petitions (signatories) they signed contained the attesting clause of the solicitor which said the signatory "signed his name thereto *in my* [solicitor's] *presence.*" (Emphasis supplied.) Each person who signed the petition knew at the time of signing that he or she *was not* signing *in the presence of* Fellows or Miller or anyone. How the principal opinion can conclude that the signatories themselves did not participate in the explicit dishonesty when the facts as recited in that opinion demonstrate complicity in the illegal conduct is beyond me.

This fact is not only of importance with respect to the petitions containing the names of Fellows and Miller as solicitors but is also of importance when deciding the question of whether *fraud* was practiced by the group seeking to get the proposition on a ballot, as compared with merely technical irregularity. As noted, Fellows was regional coordinator of the interested group. She solicited signatures through the mail in violation of the procedure required by sec. 126.061. The dissenting opinion of Morgan, C. J., points out the pervasiveness of this committee's willingness to commit any fraud necessary to get signature petitions filed by the deadline of July 6, 1978, and the attitude of its officials in the Jefferson City, Missouri, office.

It was necessary for the petitions to be in apparent compliance with the statute in order for them to be filed. The Secretary of State would not accept petitions which did not show apparent compliance. 1538

petitions containing 12960 signatures from the 4th, 5th, and 6th congressional districts were not in apparent compliance with the statute as they did not contain any attestation by a notary and, therefore, would not have been received by the Secretary of State. In order to make it appear that these were valid petitions, Stanley I. Dale, III, falsely attested to the signature of a purported solicitor on each petition. This was done for the purpose of and with the intent to deceive the Secretary of State into believing the petitions were valid and to thereby obtain a filing of the petitions in the Secretary of State's office. It is impossible for me to characterize that conduct as anything short of fraudulent. This fraud was necessary in order to accomplish a certain advantage. That advantage was that the proposition appearing on the petitions would go onto a ballot. In so doing, the Freedom to Work Committee, by practicing this *fraud*, did obtain the initial filing of petitions which could not otherwise have been filed and had they not been filed the proposition would not have had sufficient initiative signatures. It would not have even gotten to step two—Secretary of State's verification of petitions—much less have gotten onto the ballot. The other important advantage gained by this fraud was to, in effect, delay the day for filing valid signature petitions from July 6 to whenever a court would conclude that the signatures were genuine. This (being able to file invalid petitions), changed the criteria for their validity from compliance with sec. 126.061 to simply determining if the signatures were valid, according to the principal opinion. By this method the interested committee was able to evade the law which requires the filing of valid petitions by a certain date.

Thus it is clear that the facts conclusively demonstrate that actual fraud was engaged in by the officials of the group seeking to get the proposition on the ballot; that the fraud went directly to and caused the acceptance of invalid petitions by deceiving the Secretary of State into believing the petitions were valid, and further without that fraud the petitions would have been rejected and not accepted for filing. It is important to note that there was no "clerical or merely technical errors" here. Each move was calculated to produce the desired result—an acceptance of invalid petitions by the Secretary of State.

The cases of *State ex rel. Voss v. Davis,* 418 S.W.2d 163 (Mo.1967), *Kasten v. Guth,* 395 S.W.2d 433 (Mo.1965), and *Bowers v. Smith,* 111 Mo. 45, 20 S.W. 101 (1892), are cited by the principal opinion but they do not, in my opinion, support the result reached there.

*State ex rel. v. Davis, supra,* presented a purely legal question. The petitions were admittedly valid in all respects and the question was whether the original petitions for amendment to the Kansas City Home Rule Charter could be supplemented in accordance with the order of the Board of Election Commissioners. There were no irregularities, mistakes, or fraudulent acts involved at all and the facts of the case bear no resemblance whatever to the instant matter.

*Kasten v. Guth, supra,* was an *election* case and the question was whether certain ballots should be voided because the election judge or clerk had not initialed the ballots and a black sticker had not been placed over the ballot number. No purposeful or intentional misconduct or fraud appeared at all. The voter had completed his act of voting and the irregularity or deficiency was one of an election official. The instant case is not a voting case and the "irregularity" is not that of an official. Furthermore, the act of petitioning by the signatory had not been completed and would not be consummated until the petition was completed in accordance with the statute. The failure of the election official in *Kasten* to initial the ballot or place the black sticker over the number would, in my opinion, fall into the category of the clerical or technical errors referred to in sec. 126.-061. Even so, this court did not say that *fraud* would not void a ballot. To the contrary, the court said at 395 S.W.2d at 436: "While the irregularities referred to should not be encouraged, they were not sufficient

to constitute fraud, *and in the absence of fraud* we will not deprive the voters of their votes." (Emphasis supplied.)

The holding that *fraud* will invalidate votes, as set forth in *Kasten* was reiterated in *Elliott v. Hogan,* 315 S.W.2d 840 (Mo. App.1958), where ballots of sixteen absentee voters were disallowed because the ballots were not properly obtained from the election official by a political worker. There was no question but what the voter was qualified to vote and did in fact vote the ballot. The "irregularity" was committed by another person—the one who brought the ballot to the voter—but that person was not an official. *If* the issue were to turn on whether the *voter* was qualified to vote and did in fact vote the ballot, the vote should have been counted. That is what the principal opinion has converted the issue to in the instant case. But in *Elliott* the court saw the issue as relating to more than just whether the voter voted the ballot (here—whether the signer signed the petition). The issue was whether the absentee voting requirements were mandatory and whether they had been complied with. The court held they were mandatory and had not been complied with. 315 S.W.2d 847–848. There was no particular provision that declared a violation to be "fatal", but the court did not allow the ballots to be counted. This conclusion was reached because the statute respecting absentee voting was held to be mandatory. Had the defect in *Elliott v. Hogan, supra* been a *mistake of an election* official, the irregularity would not have been fatal. 315 S.W.2d 846. In the instant case the "mistake" was not that of an election official but rather intentional deceit practiced by the group pressing to get the proposition on the ballot.

The quotation taken from *Bower v. Smith,* 20 S.W. 101, 103, *supra,* and set forth in the principal opinion that construction "of a law as would permit the disenfranchisement of large bodies of voters, *because of an error of a single official,* should never be adopted, where the language in question is fairly susceptible of any other" (emphasis mine) is obviously right and should be adhered to. The only difficulty is that it has nothing to do with the instant case. There is simply no contention by anyone that the deficiency here consisted of "an error of a single official". Indeed, no one contends there were any "errors" by any officials. The "errors" here consisted of the deceitful and fraudulent acts of private persons who were attempting to get the proposition on the ballot and not of an election official.

I wonder what this court would say if petitions were presented to the Secretary of State without the signature of a solicitor or any notarization and the Secretary of State, in order to receive them so as to later determine the genuineness of individual signatures, supplied the signature of a false solicitor and the false notarization of a notary public. Would we then say there was no fraud? What of the people who had been solicited to sign and refused and the people who were not asked to sign and, therefore, did not consider signing the petitions? Are they not entitled to a reasonable enforcement of the initiative law enacted by their representatives instead of a judicial repeal of that law as accomplished by the principal opinion? And what of the signers of the contested petitions themselves? Shall we assume, as the principal opinion apparently does, that each of the 12960 people who signed these petitions authorized the people who asked the signatories to sign to proceed illegally and place false oaths and false notarizations on those petitions? I cannot assume that any or all of those people agreed that the committee, acting in the name of the signatories, could do any act, however illegal, to get the petitions filed, but that is what the principal opinion assumes. Put another way, what would be the predictable response by the individual signatories if, at the time of signing, they had been asked: Will it be all right with you if we (the committee) violate the law and cause signatures of persons who did not see you sign this document to be affixed and to swear they did see you sign it and also to cause false notarizations to be placed upon this petition? Perhaps some would agree but I doubt it. In any

event, if they did agree they would become complicit in the fraud and their signatures could not be counted under the principal opinion and if they did not agree they would not sign it.

This points up one of the major differences between signing a petition and casting one's vote. The signing of a petition solicited by another private citizen leaves something yet to be done—the appropriate attestation and the filing of the petition on time—but once a vote is cast there is nothing further for any private citizen to do. It has been done and the subsequent action is by an official who is supposed to be impartial. The petition solicitor is not expected to be impartial and is not an official. The only protection the citizenry has with respect to such petitions is the statute which requires them to be completed in a certain way.

In my opinion the principal opinion in this case judicially repeals sec. 126.061 and substitutes no protections therefor. It lends itself to much mischief. The honest groups who do not cause false solicitors' signatures to appear on their petitions nor obtain fraudulent notarizations cannot file their petitions regardless of the genuineness of the signatures but the unscrupulous can get their petitions filed by merely filling in a solicitor's name and affix a false notarization. That is what happened here and, in my opinion, this court should do more than merely announce it does not condone such fraud. It ought to deny the committee that committed the fraud the fruits of its endeavors—we should prohibit the proposition from appearing on the ballot.

No case cited by the majority opinion deals with intentional purposeful fraud. No case need be overruled. All that it takes is for this court to recognize fraud when it sees it and, pursuant to the prior cases of *Kasten v. Guth, supra,* and *Elliott v. Hogan, supra,* act accordingly.

Although, as I have stated above, I believe the statute is mandatory, yet, even if the reasoning of the principal opinion is adopted, the opportunity for mischief would be substantially reduced if this court were

to proceed as the Supreme Court of Arizona did in *Whitman v. Moore,* 59 Ariz. 211, 125 P.2d 445 (1942), a case quoted from and relied upon by the principal opinion. The *Whitman* court and the principal opinion in this case holds that if the solicitor's or notary's signatures are invalid the *presumption* that the signatures of the petitioners are genuine and are signatures of persons *registered to vote when they signed the petition disappears completely.*

In *Whitman* the court struck out signatures of persons which signatures were not followed by a date. This was done because the presumption that the signer was a qualified voter when he signed could not be indulged. It became the burden of the proponent to prove such persons were registered as of the date they signed the petition. The principal opinion in this case holds the solicitor's oath and the notary's attestation provide the presumption that the signatures are genuine and those of registered voters as of the date such persons signed the petition. It is that presumption that disappears according to the principal opinion and the *Whitman* case. The verifications obtained by the Secretary of State merely certified that, as of the time the particular county records were checked, certain persons who signed petitions were registered. This check in the counties began when the Secretary of State wrote to various election officials under date of July 11, 1978, six days after the deadline for filing the petitions. The petitions had been obtained at various times during the spring and early summer of 1978. The county verifications of registration were made as of dates in the latter part of July and in August but not as of the date the person signed the petition, whatever that may have been. In fact, one solicitor Helen Hudson testified she worked for the committee and was instructed by committee personnel in the Kansas City office that it would be all right for persons to sign the petitions even if they were not registered "as long as they were going to get registered to vote, you know."

The depositions of about 69 circulators whose petitions were not validly notarized were taken. About four or five refused to testify on 5th amendment grounds. Another two testified at trial. A goodly number of them were asked if they believed the persons who signed were registered voters to which they replied in the affirmative. Some number were not asked questions about it. Because of the time constraints with respect to the decision in this case, not all of the depositions have been read in full. A random sampling of 23 depositions were read. Of these 10 deponents were asked whether they asked the signers if they were registered voters and they responded affirmatively. But none of them were asked what the signer's answer was, if any. Nine deponents were asked whether, when they (circulators) signed the petitions, they were "swearing" (although none actually signed under oath) that the signers were registered voters to the best of their knowledge and belief to which they responded in the affirmative. Four were not asked questions concerning this matter. A few deponents testified, as did Helen Hudson, with respect to taking signatures from those who *were going* to register.

The burden of proving that the "signer was qualified in all respects" is upon the party desiring to sustain the signatures—the Freedom to Work Committee. *Whitman v. Moore, supra,* and the principal opinion in this case. That requires proof that the signers were registered to vote at the time they signed the petition—not at some later date.

In my opinion the evidence fails to affirmatively show that the signers were registered voters at the time they signed the petitions and, therefore, cannot be counted.

For all of the reasons set forth supra and those appearing in the dissenting opinions of MORGAN, C. J., and SIMEONE, J., I dissent.

SIMEONE, Judge, dissenting.

I respectfully dissent.

The principal issue in this case is not easily resolved because the resolution involves reasonable differences of judgment by reasonable men. I dissent for the following reasons. First, the issue presented is not whether Missouri should or should not adopt a "right to work" law. On that issue I take no position. The issue is whether an initiative proposal to amend the Constitution may be placed on the ballot when the orderly and specific procedures commanded by law are disregarded, ignored and not complied with.

The initiative power under the provisions of Art. III, § 49, Mo.Const. is a legitimate and proper exercise of the people's rights. But the initiative procedure so reserved to the people to propose amendments to the Constitution is an awesome power. Amending the fundamental law of Missouri should not and cannot be done lightly or done in just any manner or form. In order to amend our fundamental law all orderly and legal procedures should be adhered to. The General Assembly has established in clear and mandatory language those orderly and safeguarding procedures. Unlike earlier provisions of law dealing with initiative procedure, Section 126.061, RSMo Supp.1975 establishes a mandatory form to be followed. In such an important matter as amending the Constitution these procedures should be strictly followed. The Constitution is what we all live by. It is not sufficient to say that procedure and form are subservient to substance for in our whole history, procedure and adherence to orderly processes have been the cornerstones of the civilizing influence of law.

In the broad view, to ignore the mandatory processes would be to encourage the unscrupulous and to ignore the safeguards against possible future constitutional amendments which may well be detrimental.

Second, I do not believe I do violence to our decisions of the past. Those decisions deal with the elections of individuals in a specific election. For example in *Kasten v. Guth,* 395 S.W.2d 433 (Mo.1965), the issue was whether certain votes should be counted for a particular candidate when the bal-

lots cast and counted did not contain the clerk's initials and did not have black stickers placed over the numbers marked on the ballot. The court stated that the uppermost question in applying statutory regulation to determine the legality of votes cast and counted is whether the statute makes a specified irregularity fatal. If so, the courts enforce it to the letter. If not courts will not be astute to make it fatal by judicial construction.

Neither do I believe that *State ex rel. Kemper v. Carter*, 257 Mo. 52, 165 S.W. 773 (1914) controls the issue here. That case involves deficiencies of the secretary of state and the attorney general in complying with certain technicalities they were required to do under a mandatory statute. The court held that although the statute was mandatory as to those officials, yet as to the right of the people who voted for the proposition they were directory. The irregularities by the state official in that case are a far cry from the irregularities here.

In my opinion too, *Kaesser v. Becker*, 295 Mo. 93, 243 S.W. 346 (banc 1922) relied upon by the trial court is not controlling. There this court upheld the findings of the trial court that a number of signatures to a referendum petition should not be counted and affirmed an order of the circuit court enjoining the secretary of state from submitting a referendum to the people. The statute involved in *Kaesser* was similar to § 126.061 with one important difference. The statute in *Kaesser* proscribed the procedure but stated "The forms herein given are not mandatory, . . .". The procedure adopted in 1971 in § 126.061 makes this procedure "mandatory".

Third, I firmly believe that the people have reserved the right and power to propose amendments to the Constitution through the initiative process, but I also firmly believe that in doing so it should be done according to the methods prescribed by law and be done in accordance with law. To ignore and disregard the mandatory procedures of law relating to the initiative process would invite any group espousing any cause to seek to amend the fundamental law by illegal means which in the long run could well be detrimental to many of our democratic values.

Finally, all I say is that in the initiative process, as well as in any other judicial, administrative or legislative process the law and rules should be followed. In my opinion that was not done here in the 4th, 5th and 6th Districts and therefore I most respectfully dissent.

My view would not preclude a future vote on this important issue. That may well come in the near future but if so it should come only after there is full compliance with an orderly process. If "right to work" comes to Missouri, so be it. But let it be done under the mandatory procedure of the statute.

I therefore respectfully dissent. I would reverse the judgment of the circuit court and not permit, under the facts here, Amendment No. 23 to be placed on the November ballot. That should be left to another day.